TREG TAYLOR
ATTORNEY GENERAL

Andalyn Pace (Alaska Bar No. 1305025)
Assistant Attorney General
Department of Law
1031 West Fourth Avenue, Ste. 200
Anchorage, AK 99501
Telephone: (907) 269-5190
Facsimile: (907) 276-3697
Email: andalyn.pace@alaska.gov
Attorney for Defendants

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| RORY VAIL, JIM ADAMS, CHRISTOPHER NICKALASKEY, CLARENCE SHIRLEY, STEPHANIE OLRUN, NICK EPHAMKA, JR., ANTHONY GILLIAM, GAVIN CHRISTIANSEN, JEREMY WHITLOW, AND NAOMI HOLT, ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED,<br><br>Plaintiffs,<br><br>v.<br><br>MICHAEL DUNLEAVY, GOVERNOR OF ALASKA; JENNIFER WINKELMAN, COMMISSIONER OF THE ALASKA DEPARTMENT OF CORRECTIONS; AND TRAVIS WELCH, DEPARTMENT OF CORRECTIONS DIRECTOR OF HEALTH AND REHABILITATION SERVICES, IN THEIR OFFICIAL CAPACITIES,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) Case No.: 3:25-cv-00086-HRH<br>) |

## DEFENDANTS' MOTION TO DISMISS

## INTRODUCTION

In September 1990, the Department of Corrections (DOC)[1] entered into a comprehensive settlement agreement resolving claims in a class action making constitutional challenges to virtually every aspect of correctional operations, including mental health, dental, and medical care.[2] The lawsuit, *Cleary et al. v. Smith et al.*, began in 1981 and was vigorously litigated.[3] The parties engaged in a partial settlement agreement, a trial on the merits, years of compliance monitoring, and appellate practice, finally culminating in the *Cleary* Final Settlement Agreement (FSA). The FSA was adopted as a consent decree by the Alaska superior court, binding DOC and members of the plaintiff class, which includes "all inmates, with some exceptions, who are or will in the future be incarcerated in correctional facilities owned or operated by the state."[4]

---

[1]     At this time Corrections was a Division within the Department of Health and Social Services. The named defendants were the Commissioner of Health and Social Services, as well as the Director and Assistant Director of the Division of Corrections, and various individuals connected with the Parole Board. While DOC and the State were not defendants, for ease of reference DOC will be referred to in providing information about the *Cleary* Final Settlement Agreement.

[2]     *See* Exhibit A, *Cleary* Final Settlement Agreement and Order.

[3]     Of note, the law firm Rice, Volland and Gleason, P.C. represented the plaintiff *Cleary* class at the time of the settlement.

[4]     Exhibit A, FSA at 7. The exceptions noted in the FSA included individuals charged only with federal offenses, awaiting extradition with no other charges other than federal charges, held pending involuntary commitment proceedings, or in protective custody because of intoxication.

The FSA is still in effect and the state superior court has retained jurisdiction for enforcement actions.

In this putative federal class action, ten plaintiffs seek to represent other similarly situated inmates in DOC custody asserting claims about the alleged unconstitutionality of DOC's dental, healthcare, and mental healthcare systems.[5] Like the *Cleary* plaintiffs, they allege violations of the Eighth and Fourteenth Amendment of the U.S. Constitution. They name Governor Michael Dunleavy, Commissioner Jennifer Winkelman, and Director of Health and Human Services Travis Welch as defendants.

This case should be dismissed. Plaintiffs' claims were litigated in the *Cleary* class action, and plaintiffs are part of the *Cleary* class. The FSA, as it has been modified by legislative enactments and interpreted by state court rulings, is binding on the parties. Redress, to the extent any is appropriate, lies in the state superior court. Principles of contract, comity, and res judicata compel this result. The plaintiffs may not collaterally attack, bypass, or replace the FSA while it is in place.

Separately, Governor Dunleavy must be dismissed as a defendant. Plaintiffs have named him solely for his broad supervision of Alaska's executive branch, a claim which is barred by Eleventh Amendment immunity.

## BACKGROUND

**A.      The *Cleary* FSA provides the framework for considering future claims related to the alleged unconstitutionality of DOC's systems for providing mental health, medical, and dental care.**

---

[5]      Complaint at ¶ 280d, Dkt. 1.

*Vail, et al. v. Dunleavy, et al.*
Defendants' Motion to Dismiss

Case No.: 3:25-cv-00086-HRH
Page 3 of 38

The plaintiffs in *Cleary v. Smith*, a class action filed 1981, alleged that conditions in state correctional facilities violated various provisions of the state and federal constitutions, including the Eighth and Fourteenth Amendments.[6] Along with other contentions of unconstitutional conditions, the *Cleary* plaintiffs claimed that they were subject to unreasonable risks of harm because of inadequate supervision, understaffing, and the lack of adequate mental and physical health care. They also alleged that they did not have adequate treatment programs.[7]

There were three plaintiff subclasses: pretrial detainees (subclass A), sentenced prisoners in state owned or operated correctional centers (subclass B), and prisoners held by the state in federal facilities (subclass C).[8] In 1983, the parties reached a settlement with subclass C, and the litigation proceeded as to the others.[9]

Early litigation included partial settlement agreements and a 1984 trial, the final order of which was appealed by both sides.[10] That final order details the considerable evidence considered at trial on issues regarding medical, dental, and mental health care, among other things, as well as the superior court's conclusions of fact and law.[11] In 1987,

---

[6]     Exhibit B, Fourth Amended Complaint for Declaratory Judgment and Injunctive Relief at 4.

[7]     Exhibit B, Fourth Amended Complaint at 5–7.

[8]     Exhibit B, Fourth Amended Complaint at 3; *Smith v. Cleary*, 24 P.3d 1245, 1246 (Alaska 2001).

[9]     *See Cleary v. Smith*, 146 P.3d 997, 998 (Alaska 2006).

[10]    *See Hertz v. Cleary*, 835 P.2d 438, 440 (Alaska 1992).

[11]    *See, e.g.*, Exhibit D, Memorandum Decision at 37-51.

the superior court appointed a monitor to oversee compliance with the partial settlement agreement, and litigation about compliance and that agreement ensued.[12] Settlement negotiations resumed in 1989, and the appeals were stayed pending those efforts.[13]

Settlement discussions produced the FSA, which was adopted by the superior court in September 1990.[14] Before it was submitted to the superior court, the class members had opportunity to review the proposed FSA and provide comments.[15] Relying, in part, on these comments, a special master recommended to the superior court that the "provisions of the FSA were reasonable and in the best interests of the class."[16] The superior court adopted this finding and approved the FSA.[17]

The FSA is an 88-page document with several appendices and incorporated rulings and findings.[18] As described by the Alaska Supreme Court, the FSA "detailed the rights of current and future prisoners held in facilities owned or operated by

---

[12]    *See Hertz v. Cleary*, 835 P.2d at 440.

[13]    *Id.*

[14]    *See* Exhibit A, *Cleary* FSA.

[15]    *See Hertz*, 835 P.2d at 440.

[16]    *Id.*

[17]    *Id.*

[18]    Exhibit A, FSA. Incorporated rulings include: 1) Memorandum Decision and Findings of the Superior Court issued March 1, 1985; 2) the findings and conclusions of Special Master Sanders regarding contempt motions filed between 1983 and 1988; 3) the recommendations of the Standing Compliance Monitor Reardon made since 1988; 4) recommendations of Standing Compliance Monitor Charles Campbell made since November 1, 1989; and 5) the rulings of the trial court relating to the findings of Master Sanders and Monitor Reardon on questions of interpretation or compliance with the Partial Settlement Agreement of 1983. Exhibit A, FSA at 6.

the DOC."[19] By its terms, the FSA binds DOC and any successor agency responsible for the administration of the state's adult correctional facilities.[20] It also binds the plaintiff classes, which includes "all inmates, with some exceptions, who are or will in the future be incarcerated in correctional facilities owned or operated by the state."[21]

While the FSA outlines significantly more duties relating to correctional operation, the bulk of DOC's responsibilities relating to medical, mental health, and dental care under the FSA are as follows:

**Staffing:** DOC shall ensure that facilities are staffed with a sufficient number of trained personnel to provide the services specified in the FSA; medical staffing will be determined with the consultation of responsible health care personnel.[22] Healthcare personnel includes physicians, dentists, psychologists, optometrists, osteopaths, podiatrists, physician's assistants, and advanced nurse practitioners.[23]

**Staff training:** DOC shall ensure that security staff are adequately trained in security and emergency matters, with refresher training as appropriate.[24] Staff who provide direct counseling, medical, or mental health services are also required to be adequately trained in their field.[25]

---

[19]     *Perotti v. Corrections Corp. of Am.*, 290 P.3d 403, 405 (Alaska 2012).

[20]     Exhibit A, Cleary FSA at 6–7.

[21]     Exhibit A, Cleary FSA at 7.

[22]     Exhibit A, Cleary FSA at 14.

[23]     Exhibit A, Cleary FSA at 14 n.2.

[24]     Exhibit A, Cleary FSA at 14.

[25]     Exhibit A, Cleary FSA at 14.

**Medical and dental care:** The FSA recognizes that all inmates shall be entitled to necessary medical, dental, and mental health services comparable in quality to those available to the general public.[26] DOC is required to provide the same quality of health care to unsentenced and sentenced inmates.[27] While DOC is not obligated to provide healthcare services to improve cosmetic appearance or services for conditions long-standing prior to incarceration and not deemed necessary to alleviate pain and suffering, it is required to provide healthcare services necessary to prevent or alleviate pain and suffering, and procedures deemed necessary to increase the level of functioning throughout an inmate's sentence, such as prosthetic devices.[28]

Within 14 days after initial admission to the correctional system, DOC is required to perform a health appraisal on each inmate, unless the inmate has had an appraisal within the previous 90 days and a new appraisal is not recommended.[29]

Pretrial detainees who are incarcerated for longer than 15 days and who are determined by DOC healthcare personnel to need corrective lenses will be provided eyeglasses as prescribed by an optometrist.[30]

---

[26]     Exhibit A, Cleary FSA at 21.

[27]     Exhibit A, Cleary FSA at 21.

[28]     Exhibit A, FSA at 21.

[29]     Exhibit A, FSA at 23.

[30]     Exhibit A, FSA at 23.

DOC was to establish an internal appeal procedure to review a decision by DOC to deny treatment recommended by a consulting physician, or if review was requested by an inmate.[31]

**Mental health services:** DOC is required to perform a mental status screening of each inmate within 24 hours of the inmate's initial admission to the correctional system to identify the possibility of mental illness or the need for immediate mental healthcare.[32] If such a need is identified, the inmate is to be promptly referred for evaluation and diagnosis by a qualified mental health professional.[33]

Any inmate identified as suffering from a major mental illness shall receive the appropriate mental health treatment,[34] and DOC is to ensure that mental health professional services are available to inmates at each facility.[35] In the event an inmate has made an apparent suicide attempt, DOC is to make every effort to provide medical or mental health care personnel to promptly assess the inmate's medical or mental health needs and provide appropriate treatment.[36]

**Counseling:** DOC shall ensure that individual counseling is provided to inmates in need in all facilities, and group counseling, based on need and availability, in

---

[31]     Exhibit A, FSA at 24.

[32]     Exhibit A, FSA at 25.

[33]     Exhibit A, FSA at 25.

[34]     Exhibit A, FSA at 25.

[35]     Exhibit A, FSA at 26.

[36]     Exhibit A, FSA at 29.

sentenced facilities.[37] These services must be under the supervision of a person with a degree in the social or behavioral sciences.[38]

**Grievances:** An inmate is entitled to file a grievance about any matter, including noncompliance with the FSA, except for classification and disciplinary decisions, which have their own review process.[39] DOC was to establish the position of a Grievance and Compliance Administrator in the Commissioner's Office to implement and oversee compliance with the FSA.[40]

**Monitoring:** DOC agreed to maintain the position of a central Grievance and Compliance Administrator to oversee DOC's compliance with the FSA, train institutional compliance officers, and oversee responses to any grievances filed by inmates.[41] The Administrator must have direct access to the Deputy Commissioner and Commissioner.[42] The FSA outlines the grievance procedure, starting with filing with the institutional compliance officer, investigation, findings and recommendations, the response from the appropriate level of management, through two levels of appeal if the inmate is

---

[37]    Exhibit A, FSA at 49.

[38]    Exhibit A, FSA at 55.

[39]    Exhibit A, FSA at 70–71.

[40]    Exhibit A, FSA at 71.

[41]    Exhibit A, FSA at 83. The FSA also provided for continued oversight by a compliance monitor who reported to the court for a period of time.

[42]    Exhibit A, FSA at 83–84.

*Vail, et al. v. Dunleavy, et al.*                    Case No.: 3:25-cv-00086-HRH
Defendants' Motion to Dismiss                         Page 9 of 38

dissatisfied with the response.[43] DOC also has certain record-keeping requirements for grievances and any investigations and appeals.[44]

An inmate may not bring a direct action in court alleging noncompliance with the FSA unless the inmate exhausts this administrative grievance procedure.[45]

**Enforcement:** The terms of the agreement are a final judgment of a prospective nature and are "binding upon the Department and its successors in interest, and members of the class.[46] The superior court retained continuing jurisdiction over the litigation for purposes of enforcement or relief from judgment.[47] After the release of class counsel, any inmate could bring an action for enforcement *pro se* after first exhausting the administrative grievance procedure.

With the FSA, DOC and the *Cleary* class agreed to withdraw various appellate points and seek remand to the superior court "for the purpose of approval of this agreement."[48] The FSA remains enforceable and is under the ongoing supervision of the Anchorage Superior Court in 3AN-81-05274CI.[49]

**B.     The Alaska Prison Litigation Reform Act limits prospective relief under the *Cleary* FSA.**

---

[43]     Exhibit A, FSA at 71–73.

[44]     Exhibit A, FSA at 74.

[45]     Exhibit A, FSA at 74.

[46]     Exhibit A, FSA at 85.

[47]     Exhibit A, FSA at 85.

[48]     Exhibit A, FSA at 89–91.

[49]     Judge Thomas Matthews is currently presiding over the case.

In 1999 the Alaska legislature enacted the Prison Litigation Reform Act (APLRA)[50] to establish "standards for terminating prospective relief under the Final Settlement Agreement and any other litigation challenging prisoner conditions in Alaska."[51]

The APLRA is based on the legislature's findings that consent decrees and similar court orders that require certain levels of funding conflict with the legislature's exclusive power to appropriate under the state constitution.[52] Given the fluctuation of state revenues, the legislature needed the widest latitude to exercise its constitutional and statutory budget authority for the good of Alaskans.[53] Moreover, as the Alaska Supreme Court held, the "administration of the state corrections system is an executive concern involving many day-to-day decisions that necessitate that court interference be kept to a minimum."[54]

In 2000, DOC moved to terminate the FSA as provided by the APLRA.[55] The

---

[50]    AS 09.19.200.

[51]    *Barber v. State, Dept. of Corrections*, 393 P.3d 412, 415 (Alaska 2017).

[52]    1999 Alaska Laws Ch. 42, Sec. 1 (H.B. 214).

[53]    *Id.*

[54]    *Id.*

[55]    *See Barber*, 393 P.3d at 415; AS 09.19.200(c) ("Prospective relief ordered in a civil action with respect to correctional facility conditions, including prospective relief ordered under a consent decree, regardless of whether that civil action was filed or the relief ordered before or after August 30, 1999, shall be terminated upon the motion of the defendant unless the court finds that there exists a current violation of a state or federal right and makes the findings required by (a) of this section as to each current violation and as to each remedy and facility, as appropriate."); Exhibit C, Decision and Order at 1–2.

*Cleary* plaintiffs opposed, arguing that the statute was unconstitutional in several respects.[56] The superior court denied DOC's motion, but did conclude that the APLRA limited prospective relief under the FSA.[57] Although the APLRA could support DOC's request, terminating a final judgment presented separation of powers concerns.[58] Therefore, the superior court construed the APLRA to uphold its constitutionality by concluding that the law did not terminate the FSA, which was a final judgment, but only limited prospective relief that could be ordered under it.[59] Prospective relief would be limited to remedy violations of state or federal law.[60]

In reaching this conclusion the superior court adopted the approach taken by the Ninth Circuit regarding the substantially similar Federal Prison Litigation Reform Act—i.e., if there are ongoing state or federal constitutional violations, a court can enforce the FSA by ordering the least-intrusive means to satisfy the constitutional minimum.[61]

The superior court specifically noted that it was not reaching the question of terminating the *Cleary* class action, as opposed to the consent decree, because that question was not before it.[62]

---

[56]    Exhibit C, Decision and Order at 2–3.

[57]    *Barber*, 393 P.3d at 415.

[58]    Exhibit C, Decision and Order at 7-8; *Barber*, 393 P.3d at 415.

[59]    Exhibit C, Decision and Order at 3, 12.

[60]    Exhibit C, Decision and Order at 31; s*ee Barber*, 393 P.3d at 415.

[61]    Exhibit C, Decision and Order at 5–8; *see also Gilmore v. California*, 220 P.3d 987, 1000 (9th Cir. 2000).

[62]    Exhibit C, Decision and Order at 9.

With this motion practice, the superior court also terminated active judicial supervision.[63] Neither party appealed, and the decision became the law of the case.[64]

## C.    The state court continues to consider various motions to enforce the *Cleary* FSA.

Over the years inmates, often acting *pro se*, have sought the superior court's review of alleged violations of the FSA. The Alaska Supreme Court has considered many of these claims.[65] Three bear more in-depth discussion.

In one of the several actions filed by inmate Hertz, the Alaska Supreme Court interpreted the FSA's procedural requirements for enforcement, specifically the section that "allows a compliance challenge, after exhaustion of administrative remedies, to be brought as 'a direct action before the court *in this case*.'"[66] Hertz had filed a separate administrative appeal in the superior court alleging non-compliance with the FSA, which the superior court dismissed because he had not followed the FSA's provisions governing

---

[63]    *See Barber*, 393 P.3d at 415; Exhibit C, Decision and Order at 3.

[64]    *See Barber*, 393 P.3d at 416.

[65]    *See, e.g.*, *Antenor v. Dept. of Corrections*, 462 P.3d 1, 19 (Alaska 2020) (considering challenges to the reasonableness of telephone rates and restrictions on programming-related books under the FSA);  *Perotti v. Corrections Corp. of Am.*, 290 P.3d 403, 405 (Alaska 2012) (finding that the FSA does not provide for monetary damages to enforce its provisions); *Smith v. Cleary*, 24 P.3d 1245, 1251 (Alaska 2001) (finding that the superior court had discretion to require compliance with the FSA at an out-of-state facility holding Alaska inmates).

[66]    *Hertz v. State, Dept. of Corrections*, 869 P.2d 154, 155 (Alaska 1994) (emphasis added).

enforcement.[67] The Alaska Supreme Court upheld dismissal on those grounds,[68] interpreting the enforceability and jurisdictional provisions "to require that an inmate bring an action for non-compliance in the *Cleary* case."[69]

Later litigation filed by Hertz gave the Alaska Supreme Court the occasion to analyze the scope of enforceable remedies under the FSA, given the requirements of the APLRA.[70] Hertz had sought an injunction within the original *Cleary* caption to reinstate gate money to be paid to prisoners upon their release, a practice required by the terms of the FSA, which DOC had ceased after enactment of the APLRA.[71] The superior court denied Hertz's request for an injunction, and the Alaska Supreme Court upheld this action, concurring that the APLRA barred the relief.[72] The APLRA limited a court from ordering prospective relief unless, among other things, the plaintiff proves a violation of a state or federal right, and "discontinuance of gate money" did not violate a state or federal right.[73]

In *Barber v. State, Department of Corrections*, a 2017 opinion, the Alaska Supreme Court confirmed that the *Cleary* FSA was still in effect and

---

[67]     *Id.* at 154.

[68]     *Id.* at 155.

[69]     *Id.*

[70]     *Hertz v. State, Dept. of Corrections*, 230 P.3d 663, 665 (Alaska 2010).

[71]     *Id.* at 664, 667.

[72]     *Id.* at 667.

[73]     *Id.* at 665.

enforceable.[74] Subsequent to the 2001 order denying termination of the FSA, the presiding *Cleary* judge had changed, thus a different judicial officer considered a number of motions filed by inmates in 2013 seeking to enforce the FSA.[75] The new judge dismissed the inmates' motions, concluding that "the superior court was no longer authorized to enforce the Final Settlement Agreement."[76] He found that the former superior court judge had misinterpreted the intersection of the APLRA and the FSA, and DOC had actually met the standard for termination.[77]

The Alaska Supreme Court reversed because the 2001 order was a final judgment that was not appealed by either party, becoming the law of the case.[78] Therefore, it was "not subject to reconsideration absent a determination that 'exceptional circumstances' present[ed] 'a clear error constituting a manifest injustice.'"[79] The principles underlying the law of the case doctrine—avoidance of indefinite litigation; consistency of results in the same litigation; essential fairness between the parties; and judicial efficiency—supported requiring the parties to abide by the 2001 order.[80] The Alaska Supreme Court "reinstate[d] prisoners' rights to bring motions under the *Cleary* heading."[81] "[P]risoners

---

[74]     *Barber*, 393 P.3d at 419.

[75]     *Id.* at 414.

[76]     *Id.* at 417.

[77]     *Id.*

[78]     *Id.* at 420.

[79]     *Id.*

[80]     *Id.* at 421.

[81]     *Id.*

*Vail, et al. v. Dunleavy, et al.*                    Case No.: 3:25-cv-00086-HRH
Defendants' Motion to Dismiss                    Page 15 of 38

Case 3:25-cv-00086-SAB     Document 46     Filed 07/14/25     Page 15 of 38

may bring motions to enforce the [FSA] provided that they exhausted their administrative remedies, they allege violations of the Agreement and of a state or federal right, the violations affect the entire class, the relief requested utilizes the least intrusive means, and the court considers the adverse effects of public safety and the criminal justice system."[82]

### D. A putative class of plaintiffs have filed a new suit in federal court alleging unconstitutional provision of medical, mental health, and dental care.

Ten plaintiffs currently incarcerated in State of Alaska correctional facilities have a filed a new putative class action in this Court, seeking to represent "all persons who are now, or will in the future be, subject to the medical, mental health, and dental care policies and practices of the Alaska DOC."[83] Their 68-page complaint outlines the ways in which they believe these systems are inadequate under the Eighth and Fourteenth Amendments. In addition to asking that the Court declare that defendants Governor Dunleavy, Commissioner Winkelman, and Director Welch have violated the plaintiffs' and class members' constitutional rights, plaintiffs seek to have this Court order defendants "to develop and implement … a plan to eliminate the substantial risk of serious harm suffered by [the plaintiff class] as a result of Defendants' inadequate medical, mental health, and dental care."[84]

---

[82]     *Id.*

[83]     Complaint at ¶ 3, Dkt. 1.

[84]     Complaint at ¶ 280d, Dkt. 1.

Plaintiffs assert that this plan must include several elements: 1) adequate staffing; 2) timely access to care; 3) reliable screening methods for medical, dental, and mental health conditions; 4) timely prescription and distribution of medications and other supplies; 5) timely and competent emergency responses; 6) competent and timely access to appropriate care for chronic diseases; 7) timely access to competent and appropriate treatment for serious mental illness; 8) timely access to competent and appropriate treatment for dental problems; and 9) a quality assurance program, including a functional grievance system.[85]

Plaintiffs ask that this Court retain jurisdiction "until Defendants have fully complied with the orders of this Court and there is a reasonable assurance that Defendants will continue to comply in the future without continuing jurisdiction."[86]

The complaint makes no mention of the *Cleary* litigation.

## LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."[87] For the most part, a court must accept as true the complaint's factual allegations,[88] but "[t]hreadbare recitals of the elements of a cause of

---

[85]     Complaint at ¶ 280d(i)–(ix), Dkt. 1.

[86]     Complaint at ¶ 280f, Dkt. 1.

[87]     *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[88]     *Papasan v. Allain*, 478 U.S. 265, 286 (1986).

action, supported by mere conclusory statements, do not suffice."[89] A court is not required to accept as true "a legal conclusion couched as a factual allegation,"[90] or "allegations that contradict matters properly subject to judicial notice or by exhibit."[91]

Claim preclusion and issue preclusion are affirmative defenses that may be raised in a motion to dismiss for failure to state a claim on which relief may be granted.[92]

While generally a court does not consider materials outside of the complaint in considering a motion to dismiss under Rule 12(b)(6),[93] courts may consider judicially-noticeable facts without converting the motion into one for summary judgment.[94]

## ARGUMENT

**A.** *Res judicata* **bars plaintiffs from pursing their claims in this lawsuit.**

The Full Faith and Credit Clause of the United States Constitution, as implemented through 28 U.S.C. § 1738, mandates that a federal court "treat a state court judgment with the same respect that it would receive in the courts of the rendering

---

[89]    *Ashcroft v. Iqbal*, 556 U.S. at 678.

[90]    *Papasan*, 478 U.S. at 286.

[91]    *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001), *opinion amended on denial of reh'g*, 275 F.3d 1187 (9th Cir. 2001).

[92]    *Amina v. WMC Fin. Co.*, 329 F. Supp. 3d 1141, 1153 (D. Haw. 2018).

[93]    *Sanders v. Brown*, 504 F.3d 903, 910 (9th Cir. 2007).

[94]    *Lee v. City of Los Angeles*, 250 F.3d 668, 688–89 (9th Cir. 2001) ("[U]nder Fed.R.Evid. 201, a court may take judicial notice of "matters of public record.").

*Vail, et al. v. Dunleavy, et al.*                                          Case No.: 3:25-cv-00086-HRH
Defendants' Motion to Dismiss                                        Page 18 of 38
Case 3:25-cv-00086-SAB      Document 46      Filed 07/14/25      Page 18 of 38

state."[95] Under 28 U.S.C. § 1738 a federal court must, "as a matter of full faith and credit, … apply the pertinent state's collateral estoppel principles" to a state judgment.[96]

The *Cleary* FSA and the July 2001 Decision are final judgments and must be given full faith and credit by this Court. Plaintiffs are members of the *Cleary* class and the claims they seek to litigate were decided there. Applying Alaska *res judicata* principles, these judgments preclude plaintiffs from relitigating the *Cleary* claims in federal court. The *Cleary* parties expressly intended to bind future litigants and expressly continued the state superior court's jurisdiction for enforcement.

### 1. Claim preclusion applies.

Alaska's *res judicata* framework consists of claim preclusion and issue preclusion.[97]

With claim preclusion, "a final judgment in a prior action bars a subsequent action if the prior judgment was (1) a final judgment on the merits, (2) from a court of competent jurisdiction, (3) in a dispute between the same parties (or their privies) about the same cause of action."[98]

*Res judicata* bars relitigation of the same claim from a prior lawsuit, and litigation of new claims arising out of the same transactions as those in the first suit.[99] This second

---

[95]    *Matsushita Elec. Indus. Co., Ltd. v. Epstein*, 516 U.S. 367, 373 (1996).

[96]    *In re Cantrell*, 329 F.3d 1119, 1123 (9th Cir. 2003).

[97]    *McElroy v. Kennedy*, 74 P.3d 903, 906 (Alaska 2003).

[98]    *Id.* at 906–07.

[99]    *Smith v. CSK Auto, Inc.*, 132 P.3d 818, 821 (Alaska 2006).

transactional analysis is from the Restatement (Second) of Judgments, and involves looking at "whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage."[100]

All the elements of claim preclusion are satisfied. The FSA and July 2001 Decision are indisputably final judgments on the merits—the Alaska Supreme Court has declared them to be so and has reviewed and applied the findings in these judgments in numerous enforcement actions over the years.[101] The fact that Alaska state courts are of competent jurisdiction also cannot be questioned.

The third element is met—the dispute, causes of action, and parties are the same. The *Cleary* class consists of all inmates who are or will in the future be incarcerated in correctional facilities owned or operated by the state,[102] the same putative class for which plaintiffs seek certification. Because class actions are at issue, identity of all class members is not required for claim preclusion.[103] A consent decree can bind absent class

---

[100]    *McElroy*, 74 P.3d at 907–08. This transactional analysis is more geared towards determining whether a cause of action is barred because it should have been brought in prior litigation but was not. *See, e.g.*, *Smith v. CSK Auto, Inc.*, 132 P.3d at 821.

[101]    *See, e.g.*, *Barber v. State, Dept. of Corrections*, 393 P.3d 412, 420 (Alaska 2017).

[102]    Exhibit A, FSA at 8.

[103]    *See Gates v. Towery*, 456 F. Supp. 2d 953, 963 (N.D. Ill. 2006), *aff'd sub nom. Gates v. City of Chicago*, 623 F.3d 389 (7th Cir. 2010) ("As to the first prong, class actions provide an exception to the general rule that identity of the parties is required for *res judicata* to apply. Thus, a class action suit may bind absent class members.") (internal citations omitted).

members.[104] Similarly, the defendants are the same, policymakers who are responsible for administration of the state's adult correctional facilities.[105]

The causes of action between the past and present lawsuits are one and the same. Just as in *Cleary*, the named plaintiffs claim unconstitutionalities under the Eighth and Fourteenth Amendments in DOC's systems of providing health-related care (medical, dental, and mental health) to inmates.[106] They seek the exact same relief provided in *Cleary*—a comprehensive plan outlining DOC's responsibilities in providing dental, medical, and mental health services and continuing jurisdiction to ensure compliance.[107]

Important to this inquiry, plaintiffs are not seeking individualized remedies or damages, but rather system-wide injunctive and declaratory relief. They allege invasion of the same rights—Eighth and Fourteenth Amendments—and the same set of operative facts—alleged deficiencies in staffing, training, medications, mental health services, dental services, and internal monitoring/grievances—as *Cleary* and as addressed in the FSA. Not reaching the question of whether any named plaintiffs' individual claim would be subject to preclusive effect, the systemic nature of this lawsuit assuredly implicates *Cleary*. Although plaintiffs do not mention *Cleary* in the complaint, at core this lawsuit contends that DOC is not meeting its obligations under the FSA.

**2.      The *Cleary* FSA directs that any redress must be sought in state court.**

---

[104]    *See Ferguson v. State, Dept. of Corrections*, 816 P.2d 134, 138 (Alaska 1991).

[105]    Exhibit A, FSA at 2; Complaint ¶¶ 101–103, Dkt. 1.

[106]    Complaint ¶¶ 273–278, Dkt. 1; Exhibit B, Fourth Amended Complaint at 4.

[107]    Complaint ¶¶ 279–280, Dkt. 1.

With the elements for claim preclusion satisfied, this Court must give the FSA the same preclusive effect that it would be given in a state court. Alaska's claim preclusion doctrine "bars the litigation of any cause of action arising out of a claim which has already been litigated."[108] But as a consent decree with elements of a contract and judgment, this Court must also apply principles of contract interpretation and construe the FSA to give effect to the intent of the parties.[109] This involves looking at the written text of the FSA, as well as any extrinsic evidence regarding the parties' intent at the time it was made.[110]

The explicit language of the FSA continues the jurisdiction of the superior court, outlines the procedure for enforcement, and binds both DOC and the plaintiff class, all inmates "who are or will in the future be incarcerated in correctional facilities owned and operated by the state."[111] The Alaska Supreme Court has provided a clear interpretation of these provisions: they "require that an inmate bring an action for non-compliance in the *Cleary* case."[112]

It is notable that the *Cleary* plaintiffs opposed DOC's motion to terminate the FSA, successfully continuing the superior court's supervision of DOC's obligations under the agreement. The Alaska Supreme Court's consideration of that motion practice

---

[108]    *McElroy*, 74 P.3d at 907.

[109]    *See Hertz v. State, Dept. of Corrections*, 230 P.3d 663, 669 (Alaska 2010).

[110]    *Id.*

[111]    Exhibit A, FSA at 2.

[112]    *Hertz v. State, Dept. of Corrections*, 869 P.2d 154, 155 (Alaska 1994).

in *Barber v. State, Department of Corrections* underscores the ongoing viability and enforceability of the FSA.[113] This enforceability pertains to all parties to the FSA.

### 3. Issue preclusion applies.

Claim preclusion and contract principles conclusively directs plaintiffs to the *Cleary* matter. However, issue preclusion similarly supports dismissal and reinforces the fact that this litigation is a duplicate of *Cleary*.

Issue preclusion "renders an issue of fact or law which has already been decided by a court of competent jurisdiction conclusive in a subsequent action between the same parties, whether on the same or a different claim."[114] Alaska law imposes four requirements:

> (1) the party against whom the preclusion is employed was a party to or in privity with a party to the first action; (2) the issue precluded from relitigation is identical to the issue decided in the first action; (3) the issue was resolved by the first action by a final judgment on the merits; and (4) the determination of the issue was essential to the final judgment.[115]

If the initial litigation is a class action, the Alaska Supreme Court has adopted an additional inquiry to protect the interests of absent class members. Later litigation will only be precluded "if the class representatives are found to have made a competent attempt to protect the interests of the individual who now seeks to litigate the issue."[116]

---

[113]   *Barber v. State, Dept. of Corrections*, 393 P.3d 412, 419 (Alaska 2017).

[114]   *McElroy*, 74 P.3d at 907.

[115]   *Sykes v. Lawless*, 474 P.3d 636, 643 (Alaska 2020).

[116]   *Ferguson*, 816 P.2d at 138 (quoting *Garcia v. Board of Educ.*, 573 F2d 676, 679-80 (10th. Cir. 1978)).

The state high court has applied this analysis in the *Cleary* context, albeit to issues litigated and resolved before the FSA was approved that were "relatively insignificant aspect of the litigation and negotiations."[117]

The parties against whom the defense seeks to apply issue preclusion are the same—all inmates currently in custody or who will be in custody. The issues raised in this litigation are identical to those in *Cleary*—the constitutional requirements for DOC's systems of providing health, mental health, and dental care under the Fourteenth and Eighth Amendments. The FSA, a final judgment, specifies standards for each of the elements that plaintiffs request this Court include in its plan for DOC—staffing, staff training, timely access to different types of care, screening for medical and mental health conditions, emergency response, medication and supplies, and a grievance system.[118]

The *Cleary* class representatives adequately protected the interests of this federal putative class. The lengthy course of litigation is described above. Review of the superior court's findings after the 1984 trial shows the extent to which the parties actually litigated the issues asserted again in this lawsuit.[119] Likewise, the detailed FSA reflects the careful consideration taken to create workable and constitutional standards for providing the same health services at issue here. Class members had opportunity to provide comments on the FSA before it was adopted, and it was found to be "reasonable and in the best

---

[117]   *Id.* at 139.

[118]   *See* Complaint ¶ 280, Dkt. 1.

[119]   *See* Exhibit D, Memorandum Decision, Findings, and Conclusions.

*Vail, et al. v. Dunleavy, et al.*                    Case No.: 3:25-cv-00086-HRH
Defendants' Motion to Dismiss                    Page 24 of 38

interests of the class."[120] The successful opposition to the motion to terminate, continuing the FSA's standards for the benefit of the putative class, also highlights the competency of the *Cleary* classes' engagement in litigation.

### 4. *Hiser v. Franklin*, which discusses the preclusive effect of the *Cleary* FSA under Alaska state law on subsequent litigation, does not save this suit.

In *Hiser v. Franklin* the Ninth Circuit analyzed state law and the preclusive effect of *Cleary* on an individual litigant's claim that the defendant corrections officials denied him access to the courts by refusing to photocopy legal documents.[121] The case was on review after the district court granted summary judgment to the defendants on *res judicata* grounds.[122] The district court had agreed with the defense's arguments that the photocopying claim was, or could have been raised, in *Cleary* and was therefore barred.[123]

The Ninth Circuit reversed. Regarding the inmate's individual claims, based on the Alaska Supreme Court's statement that the issue of photocopying was not addressed in *Cleary*, the appellate court concluded that issue preclusion did not apply.[124] Under

---

[120]    *See Hertz v. Cleary*, 835 P.2d 438, 440 (Alaska 1992).

[121]    *Hiser v. Franklin*, 94 F.3d 1287, 1289 (9th Cir. 1996).

[122]    *Id.*

[123]    *Id.* at 1289–90.

[124]    *Id.* at 1290.

*Vail, et al. v. Dunleavy, et al.*                                    Case No.: 3:25-cv-00086-HRH
Defendants' Motion to Dismiss                                         Page 25 of 38

state law that doctrine only barred relitigation of "issues explicitly litigated and necessary to the judgment."[125]

Claim preclusion did not apply because the inmate's individual claim did not accrue until 1992, two years after the *Cleary* FSA.[126] Therefore and contrary to the defendants' arguments, the inmate's photocopying claim could not have been litigated in *Cleary*.[127] The Ninth Circuit also acknowledged the general rule "that a class action suit seeking only declaratory and injunctive relief does not bar subsequent individual damage claims by class members, even if based on the same events."[128]

The inmate's class action challenge to the prison's photocopying policy also was not barred.[129] Although the Ninth Circuit discussed the principles underlying claim preclusion, its analysis incorporated principles of issue preclusion as well.[130] Because the inmate had been an absent class member, the appellate court's conclusion hinged on whether the inmate's interests had been adequately represented by the *Cleary* litigants *vis a vis* the photocopying policy.[131] While the *Cleary* litigation broadly considered access to the courts, the FSA did not specifically address photocopying.[132] Therefore,

---

[125]    *Id.*

[126]    *Id.* at 1291.

[127]    *Id.*

[128]    *Id.*

[129]    *Id.* at 1292.

[130]    *Id.* at 1292–93.

[131]    *Id.* at 1293.

[132]    *Id.* at 1290.

*Vail, et al. v. Dunleavy, et al.*                                    Case No.: 3:25-cv-00086-HRH
Defendants' Motion to Dismiss                                      Page 26 of 38
Case 3:25-cv-00086-SAB     Document 46     Filed 07/14/25     Page 26 of 38

even though the photocopying claim could have been brought in *Cleary*, its absence from that litigation was not a bar because the inmate had not been adequately heard.[133]

Different from *Hiser*, as described in regards to issue preclusion, the *Cleary* parties adequately represented the interests of the present plaintiffs in litigating and agreeing to the contours of DOC's health related systems in the FSA. Unlike in *Hiser* where the FSA's general consideration of access to the courts did not give sufficient treatment to the more specific issue of photocopying, each of the elements of plaintiffs' proposed federal court plan for DOC is addressed in the FSA. As demonstrated by the order after trial and the FSA, the *Cleary* parties fully litigated issues such as staffing, accessibility to mental health, dental, and healthcare, and related services.

Further, in the instant case, the defense asks that the Court give effect to the parties' intent for the continuing jurisdiction of the superior court as expressed in the FSA. The *Hiser* court did not consider the enforceability and jurisdictional provisions of the FSA, provisions which control resolution of this motion as a matter of full faith and credit.

**B.     The *Rooker-Feldman* doctrine prevents this Court from relieving plaintiffs from the impact of the FSA.**

The *Rooker-Feldman* doctrine deprives a district court of subject matter jurisdiction over appeals of state-court decisions, both direct and *de facto*.[134] This

---

[133]     *Id.* at 1293.

[134]     *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005); *Noel v. Hall*, 341 F.3d 1148, 1154 (9th Cir. 2003).

doctrine may apply here, depending on plaintiffs' arguments in opposition. *Res judicata* is the primary reason for dismissal of this lawsuit, but *Rooker-Feldman* forecloses direct challenges to the FSA.

The Ninth Circuit Court of Appeals extensively discussed *Rooker-Feldman* in *Noel v. Hall*, reviewing its development and interplay with other principles relating to interjurisdictional litigation. The appellate court provided this summary and guidance:

> We believe that the following general formulation describes the distinctive role of the *Rooker–Feldman* doctrine in our federal system: If a federal plaintiff asserts as a legal wrong an allegedly erroneous decision by a state court, and seeks relief from a state court judgment based on that decision, *Rooker–Feldman* bars subject matter jurisdiction in federal district court. If, on the other hand, a federal plaintiff asserts as a legal wrong an allegedly illegal act or omission by an adverse party, *Rooker–Feldman* does not bar jurisdiction. If there is simultaneously pending federal and state court litigation between the two parties dealing with the same or related issues, the federal district court in some circumstances may abstain or stay proceedings; or if there has been state court litigation that has already gone to judgment, the federal suit may be claim-precluded under § 1738. But in neither of these circumstances does *Rooker–Feldman* bar jurisdiction.[135]

Applying this, plaintiffs' complaint alleges legal wrongs committed by defendants rather than the *Cleary* court. Therefore, the Ninth Circuit's guidance points towards preclusion under 28 U.S.C. § 1738 rather than *Rooker-Feldman*.

However, to the extent plaintiffs focus on the actions of the state court and argue that this Court should relieve them of the FSA's enforceability and jurisdictional

---

[135]    *Noel*, 341 F.3d at 1164.

provisions, or modify DOC's obligations under the FSA, that is a de facto appeal prohibited by *Rooker-Feldman*.

**C.    Principles of comity support dismissal.**

**1.    *Younger abstention* applies.**

*Younger* abstention, which is based on the "longstanding public policy against federal court interference with state court proceedings,"[136] is an exception to mandatory federal jurisdiction.[137] Direct interference in the state proceeding is not required; the doctrine is intended to prevent interference "which would have the same practical effect on the state proceeding as a formal injunction."[138]

*Younger* abstention applies to a civil proceeding if the state proceedings "(1) are ongoing; (2) implicate 'important state interests'; and (3) provide an adequate opportunity to raise federal questions."[139] If these three elements are met, then abstention is warranted if, in addition, "the court's action would enjoin, or have the practical effect of enjoining, ongoing state court proceedings."[140]

*Younger* abstention should apply here. Enforceability and viability of state court orders is an important state interest,[141] and this litigation threatens to vitiate a consent

---

[136]    *Herrera v. City of Palmdale*, 918 F.3d 1037, 1043 (9th Cir. 2019).

[137]    *Baffert v. California Horse Racing Bd.*, 332 F.3d 613, 617 (9th Cir. 2003).

[138]    *Gilbertson v. Albright*, 381 F.3d 965, 977–78 (9th Cir. 2004).

[139]    *Potrero Hills Landfill, Inc. v. Cnty. of Solano*, 657 F.3d 876, 882 (9th Cir. 2011).

[140]    *AmerisourceBergen Corp. v. Roden*, 495 F.3d 1143, 1149 (9th Cir. 2007).

[141]    *See Gilbertson v. Albright*, 381 F.3d 965, 973 (9th Cir. 2004).

decree under the continuing supervision of the state superior court. Importantly, this case does not involve the state interest in enforcing a one-off judgment. Rather, the state's interest here is continuing enforcement of a judgment of a decades' long lawsuit culminating in a long-lasting settlement agreement over state prisons. This litigation would interfere with a state court judgment that, since 1990, has provided a forum and standards for inmates to bring enforcement actions.

The substance of the *Cleary* litigation is similarly important—constitutional requirements for healthcare in all of the state's correctional facilities. As demonstrated by the enactment of the APLRA, there is considerable concern for use of state economic resources in meeting the demands of the FSA as well.

The litigation is ongoing, with continuing superior court jurisdiction providing plaintiffs an adequate opportunity to raise constitutional challenges. The superior court competently considered the constitutional claims in the first instance and can equally consider whether DOC is meeting its constitutional obligations under the FSA in an enforcement action. Indeed, it has done so on multiple occasions over the years.

The interference posed by this federal action goes to the very essence of the *Cleary* proceedings. Any federal order outlining a plan for DOC's health-related systems would nullify the parallel obligations in the FSA, effectively enjoining their enforcement. This could also cast uncertainty on the viability of the non-health related provisions in the FSA.

The principle behind *Younger* abstention is "the notion of 'comity,' that is, a proper respect for state functions."[142] Federal restraints is warranted to avoid duplicative legal proceedings and casting doubt "upon the state courts' ability to enforce constitutional principles."[143] The continuation of this lawsuit would cause both harms.

## 2.     Principles of wise judicial administration support dismissal.

Abstention principles under the United States Supreme Court case *Colorado River Water Conservation District v. United States* likewise supports dismissal.[144] This abstention doctrine is based on principles of "wise judicial administration," and gives "regard to conservation of judicial resources and comprehensive disposition of litigation."[145]

*Colorado River* established a "multi-pronged test for determining whether 'exceptional circumstances' exist warranting federal abstention from concurrent federal and state proceedings."[146] This test involves considering:

> (1) which court first assumed jurisdiction over any property at stake; (2) the inconvenience of the federal forum; (3) the desire to avoid piecemeal litigation; (4) the order in which the forums obtained jurisdiction; (5) whether federal law or state law provides the rule of decision on the merits; (6) whether the state court proceedings can adequately protect the rights of the federal litigants; (7) the desire to

---

[142]     *Younger v. Harris*, 401 U.S. 37, 44 (1971).

[143]     *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 604 (1975).

[144]     424 U.S. 800, 810 (1976).

[145]     *Seneca Ins. Co., Inc. v. Strange Land, Inc.*, 862 F.3d 835, 841 (9th Cir. 2017).

[146]     *Id.*

*Vail, et al. v. Dunleavy, et al.*
Defendants' Motion to Dismiss

avoid forum shopping; and (8) whether the state court proceedings will resolve all issues before the federal court.[147]

Abstention does not require that all of these factors be present, and a court will examine them in "a pragmatic, flexible manner with a view to the realities of the case at hand."[148]

While a general preference to avoid piecemeal litigation, which duplicates judicial efforts and could produce conflicting results, does not support abstention, this case presents the "particularly problematic" circumstances that do.[149] This lawsuit would entirely duplicate the *Cleary* class action—the parallelism between the two lawsuits is almost exact. This lawsuit does not just present the possibility of conflicting results with an ongoing state lawsuit, but conflicting results with a state court judgment that is subject to continuing enforcement. Reviewing similar class action lawsuits filed in other states, it can be expected that relitigating the same class action claims in this federal court will consume an exceptional amount of judicial, state, and party resources.[150]

The fact that there is a judgment conclusively demonstrates that *Cleary* is at a significantly more advanced stage. In this way, *Cleary* seems to offer a more expeditious avenue to resolve the plaintiffs' claims. There is no question that the state court will be

---

[147]    *Id.* at 841–42.

[148]    *Id.* at 842.

[149]    *See Seneca Ins. Co., Inc. v. Strange Land, Inc.*, 862 F.3d 835, 843 (9th Cir. 2017).

[150]    *See, e.g.*, *Parsons v. Ryan*, 912 F.3d 486 (9th Cir. 2018); *Parsons v. Ryan*, 754 F.3d 657 (9th Cir. 2014).

adequate to protect the rights of the litigants. It has considered these federal claims before and has overseen a consent decree that has been in place since 1990.

### D. The claim against Governor Dunleavy is a claim against the State and is barred by the Eleventh Amendment.

If this Court does not fully dismiss plaintiffs' suit, it should at least dismiss Governor Dunleavy as a defendant on sovereign immunity grounds.

The Eleventh Amendment protects the state from suit in federal court.[151] Official capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent,"[152] and they are therefore also barred by the Eleventh Amendment.[153]

*Ex parte Young* creates a limited exception to Eleventh Amendment immunity to ensure that state officials comply with federal law.[154] The exception permits "actions against state officers in their official capacities if the plaintiffs seek only a declaratory judgment or injunctive relief."[155] Among other limitations, for the *Ex parte Young*

---

[151]     *Assn. des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 943 (9th Cir. 2013) ("States are protected by the Eleventh Amendment from suits brought by citizens in federal court.").

[152]     *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 (1989) ("But a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. ... As such, it is no different from a suit against the State itself.") (internal citations omitted); *Kentucky v. Graham*, 473 U.S. 159, 165 (1985).

[153]     *Pena v. Gardner*, 976 F.2d 469, 473 (9th Cir. 1992), *as amended* (Oct. 9, 1992) ("An official sued in his official capacity has the same immunity as the state, and is entitled to eleventh amendment immunity.").

[154]     *Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993).

[155]     *Jackson v. Hayakawa*, 682 F.2d 1344, 1350 (9th Cir. 1982).

exception to apply, the named government official must have a "fairly direct" connection to the alleged unconstitutional acts.[156] Otherwise, the plaintiff naming that government official "is merely making him a party as a representative of the state, and thereby attempting to make the state a party."[157] "A generalized duty to enforce state law or general supervisory power over the persons responsible for enforcing [a] challenged provision will not subject an official to suit."[158]

The Ninth Circuit has repeatedly dismissed governors from lawsuits when plaintiffs name a governor based only on that office's duty to enforce state law.[159] For instance, in *Los Angeles Branch NAACP v. Los Angeles Unified School District,* the NAACP brought a lawsuit contending that various government actors, including education entities, the superintendent of public instruction, and the governor, had created and maintained an unconstitutionally segregated school system.[160] The Ninth Circuit

---

[156]    *See Los Angeles Branch NAACP v. Los Angeles Unified Sch. Dist.*, 714 F.2d 946, 952 (9th Cir. 1983) (quoting *Ex Parte Young*, 209 U.S. 123, 157 (1908)); *Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 943 (9th Cir. 2013) (concluding that Governor is entitled to immunity because his only connection to the law "is his general duty to enforce [state] law").

[157]    *Los Angeles Branch NAACP*, 714 F.2d at 952.

[158]    *Snoeck v. Brussa*, 153 F.3d 984, 986 (9th Cir.1998).

[159]    *See, e.g.*, *Los Angeles Branch NAACP*, 714 F.2d at 953 (dismissing governor on sovereign immunity grounds where plaintiffs did not allege that the governor had a sufficient connection to the de jure school segregation, but where the plaintiffs sought to use governor's general policy, budget, and appointment powers to gain injunctive relief); *Ass'n des Eleveurs de Canards et d'Oies du Quebec*, 729 F.3d at 943.

[160]    *Los Angeles Branch NAACP*, 714 F.2d at 947–48.

distinguished the education superintendent, who did not have sovereign immunity, from the governor, who did.

For the superintendent, the Ninth Circuit held that it was clear that office had a sufficient connection: state statute designated him as the secretary and executive officer of the State Board of Education, and the Board had policies "to adopt procedures for the orderly implementation of the obligation of districts to alleviate racial and ethnic segregation of minority students."[161]

The result was different with the governor. As to the claims that the school system was unlawfully segregated, the governor's power was limited to "making general policy and budget recommendations, as well as administrative appointments."[162] This general duty was not sufficient to abrogate Eleventh Amendment immunity.[163] The Ninth Circuit noted "that the purpose of joining the Governor as a defendant in this suit is not to remedy the effects of unconstitutional segregation since the Governor lacks the power to do so, but to use the Governor as a surrogate for the state, and thereby to evade the state's Eleventh Amendment immunity."[164]

With this backdrop, the claims against Governor Dunleavy must be dismissed. Plaintiffs' claims are wholly based on his general supervisory power of other executive officials—they allege that "he is responsible for oversight and operation of DOC,

---

[161]    *Id.* at 952.

[162]    *Id.* at 953.

[163]    *Id.*

[164]    *Id.*

including appointing the Commissioner of DOC, and proposing the budget for DOC,"[165] and that he "bears ultimate responsibility for providing all people in DOC custody with constitutional conditions of confinement, including adequate health care."[166] These are the same allegations that were insufficient in *Los Angeles Branch NAACP v. Los Angeles Unified School District*, and they do not overcome Eleventh Amendment immunity.

## CONCLUSION

With this lawsuit, a putative class identical to the *Cleary* class seeks to evade the FSA, the law of the case in *Cleary*, and have this Court issue a new version of a final judgment. Although the putative class does not name *Cleary* in its complaint, the implicit argument is that the *Cleary* judgment is insufficient, so this Court must craft a new judgment.

However, this Court must give full faith and credit to the judgments rendered in the *Cleary* litigation. The FSA and Decision and Order are continuing in nature and are under the jurisdiction of the state superior court, by agreement of the *Cleary* parties. Any recourse plaintiffs have regarding their claims of systemic deficiencies in DOC's provision of medical, mental health, and dental care is with the state court.

---

[165]    Complaint ¶ 101, Dkt. 1.

[166]    Complaint ¶ 101, Dkt. 1.

DATED: July 14, 2025.

TREG TAYLOR
ATTORNEY GENERAL


By:      s/Andalyn Pace/
         Andalyn Pace
         Assistant Attorney General
         Alaska Bar No. 1305025
         Department of Law
         1031 West Fourth Avenue, Ste. 200
         Anchorage, AK 99501
         Phone: (907) 269-5190
         Facsimile: (907) 276-3697
         Email: andalyn.pace@alaska.gov
         Attorney for Defendants

Certificate of Service
I certify that on July 14, 2025 the foregoing **Defendants' Motion to Dismiss** was served
electronically on:

Natalie S. Cauley
Ruth Botstein
ACLU of Alaska Foundation
1057 W. Fireweed Lane, Ste. 207
Anchorage, AK 99503
robert.stout@arnoldporter.com
rbotstein@acluak.org

Alejandra Uria
Jeffrey Miller
John A. Freedman
Katherine Schlusser
Luke Westerman
Robert Stout
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Avenue, NW
Washington, DC  20001-3743
alejandra.uria@arnoldporter.com
jeffrey.miller@arnoldporter.com
katherine.schlusser@arnoldporter.com

lucas.westerman@arnoldporter.com
robert.stout@arnoldporter.com

Alyssa K. Gordon
Corene T. Kendrick
David C. Fathi
Joseph Longley
Marisol Dominguez-Ruiz
Nancy Rosenbloom
American Civil Liberties Union Foundation, Inc. (New York)
125 Broad Street, 18th Floor
New York, NY 10004
akgordon@aclu.org
ckendrick@aclu.org
dfathi@aclu.org
jlongley1@aclu.org
mdominguez-ruiz@aclu.org
nrosenbloom@aclu.org

s/Andalyn Pace/_____
Andalyn Pace, Assistant Attorney General

*Vail, et al. v. Dunleavy, et al.*                    Case No.: 3:25-cv-00086-HRH
Defendants' Motion to Dismiss                    Page 38 of 38
Case 3:25-cv-00086-SAB      Document 46      Filed 07/14/25      Page 38 of 38